1
Richard A. Jones
United States District Court Judge

2

3

4

5

6

7

8    IN THE  UNITED STATES  DISTRICT COURT
FOR  THE  WESTERN  DISTRICT  OF  WASHINGTON
9    SEATTLE   DIVISION

10   HEATHER BELINDA                ) CIVIL NO.: 2:11-cv-01247-RAJ
     SINGLETON, individually,       )
11                                   ) DEMAND FOR JURY TRIAL
                      Plaintiff,     )
12                                   ) SECOND  AMENDED COMPLAINT RE:
                                     )
13            vs.                    ) RACKETEER INFLUENCED AND
                                     ) CORRUPT ORGANIZATIONS ACT OF
14   BANK OF AMERICA, N.A., a        ) 1970  ["RICO"] [TITLE 18 UNITED
     national banking association;   ) STATES CODE §§ 1961(1), 1961(3),
15   RECONTRUST COMPANY, N.A.,       ) 1961(4), 1961(5), 1962(a), 1962(b),
     a national banking association; ) 1962(C), 1962(d), 1964(a), 1964(b),
16   MORTGAGE ELECTRONIC             ) and 1964©) RE: FEDERAL
     REGISTRATION SYSTEMS, INC.,     ) DECLARATORY RELIEF JUDICIALLY
17   a Delaware corporation; and, U.S.) VITIATING  and INVALIDATING
     BANK, N.A., a national banking  ) DEEDS  OF TRUST and ADJUSTABLE
18   association,                    ) RATE  NOTE and NOTE
                                     )
19                                   )
                      Defendants.    )
20   _____)

21        Plaintiff Heather Belinda Singleton, individually, advances, alleges,  articulates, asserts,

22   contends, and  complains, by and  through  plaintiff's Second Amended Complaint,  advancing

23   multiple  monetary  claims for relief, multiple equitable claims for relief,  and multiple  declaratory

24   claims for relief, as specifically articulated and expressly enumerated and identified herein below

25   against defendants, and each and everyone of them, jointly and severally, Bank of America, N.A.,

26   a national  banking  association, ReconTrust  Company, N.A., a  national  banking  association,

27   Mortgage Electronic Registration Systems, Inc., a Delaware corporation, U.S. Bank, N.A., a national

28   banking association

     SECOND AMENDED RICO COMPLAINT

FEDERAL COMPETENT SUBJECT MATTER JURISDICTIONAL ALLEGATIONS

1.      Competent subject matter jurisdiction and venue exists, in whole and/or in part, pursuant to the following federal statutes:

    A.      Section 1964(a) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"][Title 18 United States Code §1964©, 1965(a), (b), and (d)].

    B.      Federal Question Jurisdiction [Title 28 United States Code §1331].

    C.      Federal Declaratory Judgment Act of 1946 [Title 28 United States Code §§ 2201-2202].

    D.      Federal Supplemental Jurisdiction [Title 28 U.S.C. § 1367(b)].

2.      Plaintiff is, and during all times material herein has been, an individual engaged in business activities within the State of Washington. Plaintiff engages in activities and conduct that affect federal interstate and/or foreign commerce.

3.      Plaintiff alleges that during all times material herein

        ♦      Bank of America, N.A., a national banking association

        ♦      ReconTrust Company, N.A., a national banking association

        ♦      Mortgage Electronic Registration Systems, Inc., a Delaware corporation, a subsidiary corporation of MERSCORP, Inc., a Delaware corporation

        ♦      U.S. Bank, N.A., a national banking association

        ♦      BAC Home Loan Servicing, LP, a California corporation

        ♦      Bank of America Home Loans, a California corporation

        ♦      Bank of America Corporation, a North Carolina corporation

        ♦      West Valley Enterprises, Inc., a Washington corporation

        ♦      Novastar Mortgage, Inc.

        ♦      West Valley Mortgage

        ♦      Brandon Rakes

        ♦      Scott Holsten

        ♦      Wilshire Credit Corporation

        ♦      La Salle Bank, National Association

1    ♦    MERSCORP, Inc., a Delaware corporation

2    are each a "person" as that term is defined pursuant to Section 1961(3) of the

3    Racketeer Influenced and Corrupt Organizations Act of 1970 ["RICO"].

4        4.    Plaintiff alleges, and ReconTrust expressly admits, at ¶ 2.3, of ReconTrust's Answer

5    and Affirmative Defenses filed 9 September 2011, in *State of Washington, v. ReconTrust Company,*

6    *N.A.*, U.S.D.C. W.D. Wa,,No. 2:11-cv-01460-JLR, that ReconTrust conducts Trustee Sales of

7    residential property as the trustee under deeds of trust securing residential mortgage loans serviced

8    by Bank of America, N.A., the successor by merger to BAC Homes Loans, Servicing, LP,

9    ["BACHLS"] and by BACHLS prior to its merger with Bank of America, N.A.

10       5.    Plaintiff alleges that U.S. Bank, N.A, a national banking association, is engaged in

11   activities that affect federal interstate and/or foreign commerce, including engaging in business

12   activities within the City of Seattle, County of King, State of Washington. Plaintiff alleges that

13   during all times herein that U.S. Bank, N.A., is the successor in interest to La Salle Bank, N.A.,

14   Trustee, Merrill Lynch Mortgage Investors, Inc., MLMI 2006-HE4 Pool 669, a business entity,

15   served as trustee of the afore referenced mortgage backed securities issuer, and offered,

16   promoted, and sold mortgage backed securities. Plaintiff alleges that the "holder" of the mortgage

17   notes, US Bank investor number 7040083, cannot as a matter of law be a "holder" as alleged herein.

18       6.    Plaintiff alleges that each and every defendant is liable as a principal pursuant to Title

19   18 United States Code §§ 2(a)-(b) and that each and every defendant is liable as a co-conspirator

20   pursuant to Title 18 United States Code § 371. Plaintiff further alleges that the acts, conduct,

21   activities, and/or omissions committed by any one defendant are attributable to all of the other

22   defendants.

23       7.    Predatory mortgage lending practices is a term which refers to the

24   practice of making a loan which the lender knows that the borrower is unlikely to be able to repay

25   and will end up in default with the lender taking the home and its equity. It often, as in this case,

26   involves fraudulent representations of income in the loan origination documents to qualify for the

27   loan. It was an integral part of a larger fraudulent practice by mortgage lenders and mortgage brokers

28   to misrepresent the true value of mortgages sold by mortgage lenders to the mortgage backed

3    SECOND AMENDED RICO COMPLAINT

1  securities market.   Plaintiff, and tens and thousands like plaintiff, were the fodder of an enormous
2   plan to  defraud the housing market at the expense of residential home loan borrowers and those
3  who purchased or insured the loans as more fully set forth below.

4       8..      By early 2006, mortgage lenders such as West Valley Enterprises, Inc.,West Valley
5  Mortgage, Novastar  Mortgage, Inc., and Wilshire Credit Corporation were in the  midst of an
6  extremely aggressive lending period competing with mortgage companies such as Bank of America,
7  N.A., Wells Fargo Bank, N.A.,  Countrywide Financial Services, Countrywide Bank, N.A.,Treasury
8  Bank, N.A., Countrywide  Home  Loans, Inc., Countrywide  Financial Corporation, and others.
9  Many mortgage lenders were deeply involved in selling its loans in the mortgage backed securities
10 market.

11      9.     To   meet this competition and reap huge  profits, those mortgage lenders  had
12 instituted  certain policies which dispensed with auditing the loans to see if the borrowers met
13 mortgage lender requirements. One such program  was known as a "Stated  Income  Loan" ["SIL"]
14 also known as a "No-Doc" or no documentation loan. It was the mortgage lenders' policy under the
15 SIL program to accept, without any documentation, whatever income was stated in the loan
16 application.

17      10.    West Valley Enterprises, Inc., and West Valley Mortgage knew inflated
18 incomes were being stated by its loan officers and loan brokers in mortgage loan applications.  As
19 part of its fraudulent lending scheme, West Valley Enterprises, Inc., and West Valley Mortgage
20 discouraged its internal auditors from requiring documentation or reviewing the loan documentation,
21 particularly income documentation for SIL loans.  It was the policy of West Valley Enterprises, Inc.,
22 and West Valley Mortgage to accept, without any documentation, whatever income was stated within
23 the mortgage loan application.

24      11.    West Valley Enterprises, Inc., and West Valley Mortgage , like so many
25 other mortgage lenders, knew inflated incomes were being stated by its mortgage loan officers and
26 mortgage loan brokers in mortgage loan applications.  As part of its fraudulent mortgage lending
27 scheme, West Valley Enterprises, Inc., and West Valley Mortgage, like many other mortgage
28 lenders, discouraged its internal auditors from requiring documentation or reviewing the loan

documentation, particularly income documentation for SIL mortgage loans.

12.     In making mortgage loans, West Valley Enterprises, Inc., and West Valley Mortgage, as well as Bank of America, N.A., Novastar Mortgage, Inc., Wells Fargo Bank, N.A., Countrywide Financial Services, Countrywide Bank, N.A.,Treasury Bank, N.A., Countrywide Home Loans, Inc., and Countrywide Financial Corporation had certain underwriting requirements in connection with the mortgage market to insure that the mortgage loans were of a certain quality. Purchasers of mortgage loans relied upon those requirements when acquiring the mortgage loans. These underwriting requirements were incorporated into a mortgage loan origination computer program known as the Automated Credit Application Processing System or "ACAPS" which mortgage lenders employed to evaluate mortgage loan eligibility.  Mortgage loans were automatically approved or denied based upon the values input into the ACAPS mortgage loan origination computer program.

13.     Based upon a mortgage lender's underwriting requirements, the mortgage loans were then offered and sold in the mortgage backed securities secondary market where they were purchased by government sponsored entities such as Federal Home Loan Mortgage Corporation ["Freddie Mac"], Federal National Mortgage Association ["Fannie Mae"], and others.  Consequently, as a proximate and direct result and mediate cause arising from the acquisition of such "toxic" mortgage asset- backed "securitized" interests, the Federal Housing Finance Agency initiated in the United States District Court for the Southern District of New York, commencing in July, 2011, and as most recently as late October, 17 federal securities fraud suits seeking recovery of multi billions in damages.

14.     The quality of a mortgage loan affects its value in the mortgage backed securities secondary market and the risk to those who purchase or invest in the mortgage loans or insure payment of the mortgage loans in the event of default.  One of the most important factors in determining the quality of a mortgage loan is the ratio of the borrowers overall monthly income to monthly loan payment.  The higher the income, the safer the loan.

15.     A common practice in predatory mortgage lending is to overstate the borrower's income to present a better, more attractive ratio of overall income to mortgage obligation.

5      SECOND AMENDED RICO COMPLAINT

1   This is a fraudulent misrepresentation of the market value of the mortgage loan and defrauds the

2   purchasers, underwriters, and investors when the mortgage loan is sold.  The artifice and scheme

3   also defrauds the borrower by placing the borrower in a financial situation in which the borrower will

4   be unable to meet the borrower's monthly mortgage payment obligation.  This results in the

5   borrower's default on the mortgage loan and foreclosure of the mortgaged property with its attendant

6   loss of home equity for the borrower to the extent the value of the home exceeded the value of the

7   loan.

8          16.    Issues regarding the adherence of financial lending institutions to the

9   underwriting standards were not initially of concern to the lenders, purchasers, and underwriters

10  because the value of the collateral was required to exceed the market value of the mortgage loan at

11  the time the loan was made.  It was an underlying assumption of the industry that the housing market

12  would continue to appreciate.  At first, it was more profitable for the lenders and trusts to foreclose

13  predatory mortgage loans than maintain those loans.

14         17.    Because predatory mortgage loans are highly likely to fail, the number of

15  foreclosures increased significantly and correspondingly depressed the housing market so severely

16  that the collateral for the mortgage loans, the market value of the homes, became less than the

17  amount of the loan, i.e., the loan to value ["LTV"] became greater than 100%.  Mortgage loans in

18  which the LTV ratio exceeded   100% were referred to as being "underwater."  When underwater

19  predatory  mortgage home loans were foreclosed, the insurers and secondary market holders

20  sustained the loss, including the current demise of both Fannie Mae and Freddie Mac.

21  *See generally*, Harvard University Joint Center for Housing Studies, *The State of the Nation's*

22  *Housing 2011, available at* http://www.jchs.harvard.edu/publications/ets/011/son2011.pdf.

23         18.    MERS is a private electronic database, operated by MERSCORP., Inc., the parent

24  corporation of MERS, that tracks the transfer of the "beneficial interest" in home loans, as well as

25  any changes in mortgage loan servicers.  After a borrower takes out a home loan, the original lender

26  may sell all or a portion of its beneficial interest in the loan and change mortgage loan servicers.

27  Plaintiff's two [2] mortgages specifically identify MERS as the purportedly "beneficiary" and

28  purportedly "nominee" upon both deeds of trust executed in early April, 2006.

6     SECOND AMENDED RICO COMPLAINT

1       19.    The owner of the beneficial interest is entitled to repayment of the loan.

2   For simplicity, plaintiff shall refer to the owner of the beneficial interest as the "lender."  The

3   servicer of the loan collects payments from the borrower, sends payments to the lender, and handles

4   administrative aspects of the loan.  Many of the companies that participate in the mortgage industry

5   – by originating loans, buying or investing in the beneficial interest in loans, or servicing loans – are

6   members of MERS and pay a fee to use the tracking system.

7       20.    When a borrower takes out a home loan, the borrower executes two documents in

8   favour of the lender: (1) a promissory note to repay the loan, and (2) a deed of trust, or mortgage, that

9   transfers legal title in the property as collateral to secure the loan in the event of default.  State laws

10  require the  lender to record the deed in the county in which the property is located.  Any subsequent

11  sale or assignment of the deed must be recorded in the county records, as well.

12      21.    This recording process became cumbersome to the mortgage industry, particularly

13  as the trading of loans increased.  *See* Robert E. Dordan, *Mortgage Electronic Registration System*

14  *(MERS), Its Recent Legal Battles, and the Chance for a Peaceful Existence*, 12 Loy. J. Pu. Int. L.

15  177, 178 (2010) and Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending, and The*

16  *Mortgage Electronic Registration System*, 78 University of Cincinnati L. R.  1359  (Summer 2010).

17      22.    At the origination of the loan, MERS is designated in the deed of trust as a nominee

18  for the lender and the lender's "successors and assigns," and as the deed's "beneficiary" which holds

19  legal title to the security interest conveyed.   If the lender sells or assigns the beneficial interest in

20  the loan to another MERS member, the change is recorded only in the MERS database, not in county

21  records, because MERS continues to hold the deed on the new lender's behalf.  If the beneficial

22  interest in the loan is old to a non-MERS member, the transfer of the deed from MERS to the new

23  lender is recorded in county records and the loan is no longer tracked in the MERS system.

24      23.    In the event of a default on the loan, the lender may initiate foreclosure

25  in its own name, or may appoint a trustee to initiate foreclosure on the lender's behalf.  However,

26  to have the legal power to foreclose, the trustee must have authority to act as the holder, or agent of

27  the holder, of both the deed and the note together.

28      24.    One of the main premises of legal claims asserted against the MERS system is that

7    SECOND AMENDED RICO COMPLAINT

1  MERS impermissibly "splits" the note and deed by facilitating the transfer of the beneficial interest

2  in the loan among lenders  while  maintaining MERS as the nominal holder of the deed.

3      25.    Another premise of legal claims asserted against the MERS system is that MERS

4  does not have a financial interest in the loans, which, according to such claims, renders MERS's

5  status as a beneficiary a sham.  MERS is not involved in originating the loan, does not have any right

6  to payments on the loan, and does not service the loan. MERS relies on its members to have

7  someone on their own staff become a MERS officer with the authority to sign documents on behalf

8  of MERS.

9      26.    The legality of MERS's role as a beneficiary may be at issue where MERS  initiates

10  foreclosure  in its own name, or where the plaintiffs allege a violation of state recording and

11  foreclosure statutes based on the designation. *See Hooker v. Northwest Tr. Servs.*, No. 10-3111, 2011

12  WL 2119103, at *4 (D. Or. May 25, 2011)(concluding that the defendants' failure to register all

13  assignments of the deed of trust violated Oregon recording laws so as to prevent non-judicial

14  foreclosure).

15      27.    The fact that MERS has come under increasingly intense  scrutiny by the United

16  States government, specifically, the United States of America Department of the Treasury,

17  Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit

18  Insurance Corporation, Office of Thrift Supervision, and Federal Housing Finance Agency, is

19  exemplary of the significance of the legal issues advanced in both federal and state court litigation

20  relative to the role of MERS in the foreclosure area. *See In the Matter of: MERSCORP, Inc., and the*

21  *Mortgage Electronic Registration Systems, Inc.*, Consent Order and Stipulation and Consent to the

22  Issuance of a Consent Order,   entered 13 and 12 April 2011.

23      28.    Plaintiff hereby respectfully requests  that this Honorable Court, pursuant to Rule 201

24  of the Federal Rules of Evidence, previously filed herewith,  judicially notice the following entered

25  Order  Certifying  Question To The Washington Supreme Court, entered 27 June 2011, *Kristin Bain*

26  *v. Metropolitan Mortgage Group  Inc.*, et.al., U.S.D.C. W.D. Wa., Case No.: 2:09-cv-0149 -JCC ,

27  and *Kevin Selkowitz v. Litton Loan Servicing LP* et.al., U.S.D.C. W.D. Wa., Case No.: 2:10-cv-523

28  -JCC, pursuant   to R.C.W. 2.60.020, certifying  three [3] specific questions to the Washington

Supreme Court regarding Mortgage Electronic Registration Systems, Inc., ["MERS"]:

> (1)   Whether MERS is a lawful beneficiary within the terms of Washington's Deed of Trust Act, Revised Code of Washington 61.24.005, if MERS never held the promissory note secured by the deed of trust?
>
> (2)   If so, what is the legal effect of MERS acting an unlawful beneficiary under the terms of Washington's Deed of Trust Act?
>
> (3)   Does a homeowner possess a cause of action under Washington's Consumer Protection Act against MERS if MERS acts an unlawful beneficiary under the terms of Washington's Deed of Trust Act?

29.   Plaintiff duly and expressly notes that inasmuch and because this matter involves important and far-reaching issues of first impression regarding MERS's ability to serve as the beneficiary and nominee of the lender under Washington's Deed of Trust Act, the federal district court certified the afore identified specific inquiries and presented sam for expedited review to the Washington Supreme Court. The federal court duly noted the numerous foreclosure proceedings being litigated in Washington courts, both federal and state, involving these specific issues of legal significance regarding MERS, and that certification of those particular questions was warranted to promote the important judicial interests of both efficiency and comity. Oral argument was heard before the Washington Supreme Court on *15 March 2012*, and a ruling is anticipated forthwith.

30.   Plaintiff hereby respectfully requests that this Honorable Court, pursuant to Rule 201 of the Federal Rules of Evidence, previously filed herewith, judicially notice the *filed* complaint by the Attorney General of the State of Washington, with King County Superior Court on 5 August 2011, entitled *State of Washington v. ReconTrust Company, N.A.*, Case No.: 11-2-26867-5 SEA, obtained from www.atg.wa.gov. The referenced complaint alleges that ReconTrust, N.A., a corporate affiliate of Bank of America, N.A., is engaged in both unfair practices and misrepresentations in contravention of R.C.W. 19.86.020 of the Washington Consumer Protection Act relative to non-judicial foreclosure proceedings as a foreclosure trustee in the State of Washington.

31.   Plaintiff duly notes that the issues advanced, asserted, and posited within plaintiff's

9   SECOND AMENDED RICO COMPLAINT

1   amended complaint involve, in significant part, the issues advanced by the State of Washington

2   complaint inasmuch as plaintiff's mortgages are serviced by Bank of America, N.A., and BAC Home

3   Loans Servicing, L.P., a wholly owned subsidiary of Bank of America, N.A., and that ReconTrust

4   acts as foreclosure trustee in the State of Washington.

5          32.   Plaintiff alleges that MERS both functions and serves in a vitally significant and

6   integral *"sine qua non"* capacity and position: "*but for*" the inclusion of MERS on a deed of trust

7   at the origination and inception of the mortgage transaction, the securitization of mortgage back

8   secured interests could not, and would not, and would be incapable of, being offered, promoted, and

9   sold. MERS is a significant constituent component of the artifice and scheme to defraud as alleged

10  herein, and mortgage lenders know, and have reason to know, that without the presence of MERS

11  appearing upon a deed of trust, the mortgage backed securities could not be generated, offered, and

12  sold.

13         33.   Plaintiff alleges that MERS affirmatively acquiesces, authorizes, and

14  consents to mortgage financing lending institutions expressly inserting MERS's name upon deeds

15  of trust as an alleged "beneficiary" and as an alleged "nominee" in order to facilitate and further the

16  generation, origination, implementation, and execution of mortgage backed securities offerings as

17  alleged herein after.

18         34.   Plaintiff alleges that as a result of MERS affirmatively acquiescing, authorizing, and

19  consenting to mortgage financing lending institutions expressly inserting MERS's name upon deeds

20  of trust as an alleged "beneficiary" and as an alleged "nominee," MERS ratified, adopted, and

21  confirmed the representations, statements, and presentations by said mortgage financing lending

22  institutions as representations, statements, and presentations of MERS.

23         35.   Plaintiff alleges that material omissions, material misrepresentations, and material

24  misstatements committed by mortgage financing lending institutions in connection with the

25  origination of mortgage financing similarly constitutes material omissions, material

26  misrepresentations, and material misstatements committed by MERS to mortgagors.

27         36.   Plaintiff alleges that without the active participation and involvement of

28  MERS with the mortgage lending institutions, as alleged herein, no financial or commercial

1    incentive would exist to otherwise create, promote, and sell mortgage backed securities.

2        37.    Plaintiff's real property market value has significantly diminished since

3    2009, according to the Official Valuation Change Notice,   for real property tax purposes by the

4    Thurston County Assessor, follows:

5        ♦    2009: Land ($174,700); Structures ($263,800): Total: $438,500

6        ♦    2010: Land ($145,600); Structures ($236,400): Total: $372,000

7        ♦    2011: Land ($132,600); Structures ($206,000): Total: $338,600

8        38.    Plaintiff alleges that the present market value of plaintiff's real property

9    is approximately 50% less than the two [2] combined mortgages plaintiff contests.

10       39.    Plaintiff alleges that "but for" the concerted activities of defendants as

11   alleged herein, plaintiff would not have suffered and sustained the injuries to plaintiff's interests in

12   plaintiff's business and/or property.  Plaintiff was provided unsuitable mortgages, with defendants'

13   West Valley actual knowledge, and rather than place plaintiff with a conventional mortgage that

14   plaintiff could have easily afforded and qualified for, the nature of mortgage backed securities being

15   promoted  and sold to both Fannie Mae and Freddie Mac necessitated the offer and promotion of

16   sub-prime mortgages, such as the mortgages offered and promoted to plaintiff.

17       A.    First Mortgage – $600,000.00 – 13625  93rd  Avenue Southeast,  Yelm,

18             Washington 98597

19       40.    Plaintiff alleges that commencing on or about 1 April, 2006, and continuing

20   thereafter,  by and through the employment of  federal interstate mails and/or  federal interstate

21   wires, West Valley Enterprises, Inc., and West valley Mortgage,  ["West Valley Enterprises" and

22   "West Valley Mortgage"], to plaintiff, locate at 775 East Blithedale Avenue, # 510, Mill Valley,

23   California 9494 12511 Meridian East, Suite 102, and Suite 202, Puyallup, Washington  98373,

24   www.thewestisthebest.com, by and through West Valley duly authorized corporate   directors,

25   officers, agents, representatives, deputies, designees, nominees, and/or  servants, transmitted 1,

26   affirmatively represented to plaintiff that West Valley Enterprise would qualify plaintiff to obtain

27   two [2]  mortgages to acquire certain residential property situated at 13625 93rd Avenue Southeast,

28   Yelm, Washington 98597.  Plaintiff alleges that West Valley Enterprises, Inc., and West Valley

11    SECOND AMENDED RICO COMPLAINT

1   Mortgage, actively solicited plaintiff by and   through, *inter alia*, the corporate business website,

2   www.thewestisthebest.com, for purposes of promoting mortgage financing services.

3        41.    Plaintiff alleges that said instruments were identified by "document date" April 7,

4   2006, "closing date" April 14, 2006, and "disbursement" April 10, 2006, Loan No.:# 06-273426, and

5   Escrow No.: # 507270.  Plaintiff required to pay $22,570.98, at closing, by direct wire transfer to

6   Key Bank, 700 Fifth Avenue, Floor 46, Seattle, WA 98104, for direct deposit into  the corporate

7   account of Stewart Title & Escrow, 300 Deschutes Way, Suite 201, Tumwater, Washington 98501,

8   attention: Kelly Weaver, LPO, pursuant to Stewart Title & Escrow letter dated 10 April 2006,

9   transmitted to plaintiff's residence in Mill Valley, CA.

10       42.    Plaintiff alleges that on 10 April 2006, West Valley Enterprises,

11  represented by Scott Holsten, and West Valley Mortgage, represented by Brandon Rakes, presented

12  and  transmitted  via federal  interstate mails and/or federal interstate wires, traversing the states of

13  Washington and California, certain instruments to plaintiff for review, execution, and return to

14  Stewart Title & Escrow, 300 Deschutes Way, Suite 201, Tumwater, Washington 98501, the most

15  significant documents identified herein below:

16          ◆    *Specific Closing Instructions* summarizing "*Loan Terms*" (Loan Amount:

17                  $600,000.00; Sales Price:$750,000.00; Term: 360 months; Interest Rate:

18                  9.10%; Monthly Principal and Interest: $4,550.00; First Payment Date: June

19                  1, 2006; Last Payment Date: May 1, 2036; ARM Loan (Yes); Index: 5.143;

20                  Margin: 5.600%; First Rate Cap: 3.000%; Periodic Rate Cap: 1.000%;

21                  Lifetime Rate Cap: 7.000%; Lifetime Rate Floor: 9.100%; Interest Change

22                  Date: May 1, 2008; Payment Change Date: June 1, 2008; Loan Purpose:

23                  Purchase; "*Secondary Financing*" (Secondary financing in the amount of

24                  $150,000.00 has been approved)

25          ◆    *Fannie Mae Form 1003 Uniform Residential Loan Application*, dated April

26                  7, 2006.  Interview conducted by Brandon Rakes, West Valley Mortgage;

27                  gross monthly income listed at $20,500.00

28          ◆    *Payment Letter to Borrower* specifically identifying monthly mortgage

payment of $4,994.55 [principal and interest; $4,550.00; reserve for taxes: $373.38; and, reserve for insurance: $71.17] payable to West Valley Enterprises, Inc

- ◆ *ARM Disclosure Interest Only Program* – interest rate based on the average of interbank offered rates for six month U.S. dollar denominated deposits in the London Market ("LIBOR"), as published in the Wall Street Journal; the interest rate of 9.10% applied cannot exceed 16.100%, in the sixth [6th] year of the mortgage..

- ◆ *Adjustable Rate Note* (LIBOR  Six-Month Index (As Published in the Wall Street Journal) – Rate Cap), dated April 7, 2006.  Interest rate will not be less than 9.100%, and not greater than 16.100%; interest rate change and payment on May 1, 2008, increased.

- ◆ *Interest-Only Addendum to Fixed/Adjustable Rate Note*, dated April 7, 2006. Interest only payments for the first 60 payments.

- ◆ *Deed of Trust*, dated April 7, 2006.   Trustee designated: Quality Loan Services, 1770 Fourth Avenue, San Diego, CA 92101; <u>MERS</u> [*Mortgage Electronic Registration Systems, Inc.*] "acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument." Plaintiff identified as 'Grantor' and MERS identified as 'grantee." Pages 3 and 4 of 16 states the role of MERS under the Deed of Trust.

- ◆ *Interest-Only Rider To The Security Instrument*, dated April 7, 2006. (Rider supersedes Sections3(A) and (B), and 5 of  the Note.  None of the other provisions if the Note are changed by this addendum).

- ◆ *Adjustable Rate Rider* (LIBOR Six-Month Index (As Published in The Wall Street Journal) – Rate Caps), dated April 7, 2006.  Rate change effective May 1, 2008

B.   Second Mortgage – $150,000.00 – 13625  93rd  Avenue Southeast,  Yelm,

1    Washington 98597

2    43.    Plaintiff alleges that on 10 April 2006, West Valley Enterprises, represented by Scott

3    Holsten,  and West Valley Mortgage, represented by Brandon Rakes, presented and transmitted via

4    federal interstate mails and/or federal interstate wires, traversing the states of Washington and

5    California, certain instruments to plaintiff for review, execution, and return to Stewart Title &

6    Escrow, 300 Deschutes Way, Suite 201, Tumwater, Washington 98501, the most significant

7    identified herein below:

8    ◆    *Specific Closing Instructions* summarizing "*Loan Terms*" (Loan Amount:

9    $150,000.00; Sales Price:$750,000.00; Term: 180 months; Interest Rate:

10    10.85%; Monthly Principal and Interest: $1,411.51; First Payment Date: June

11    1, 2006; Last Payment Date: May 1, 2036; ARM Loan (No); Index: 0;

12    Margin: 0; First Rate Cap: 0; Periodic Rate Cap: 0; Lifetime Rate Cap: 0;

13    Lifetime Rate Floor: 0; Interest Change Date: 0; Payment Change Date: 0;

14    Loan Purpose: Purchase Money Junior

15    ◆    *Fannie Mae Form 1003 Uniform Residential Loan Application*, dated April

16    7, 2006.  Interview conducted by Brandon Rakes, West Valley Mortgage;

17    gross monthly income listed at $20,500.00

18    ◆    *Note*, dated April 7, 2006, $150,000.00, balloon payment due 05/01/2021,

19    annual interest rate: 10.850%

20    ◆    *Deed of Trust*, dated April 7, 2006.  Trustee designated: Quality Loan

21    Services, 1770 Fourth Avenue, San Diego, CA 92101; *MERS* [*Mortgage*

22    *Electronic Registration Systems, Inc.*] "acting solely as a nominee for Lender

23    and Lender's successors and assigns.  MERS is the beneficiary under this

24    Security Instrument." Plaintiff identified as "Grantor" and MERS identified

25    as "grantee;"    "THIS SECURITY INSTRUMENT IS SUBORDINATE TO

26    AN EXISTING FIRST LIEN OF RECORD"

27    44.    Plaintiff alleges that certain of the afore identified written instruments

28    relative to the first mortgage and the second mortgage  transmitted  to  plaintiff, located in Mill

14    SECOND AMENDED RICO COMPLAINT

Valley, CA,  from West Valley Enterprises and West Valley Mortgage, located in  Puyallup, WA, by and through the federal interstate mails and/or federal interstate wires, for plaintiff's review, execution, and return to Stewart Title & Escrow, were materially misrepresentative of material facts about the adjustable rate note, the deeds of trust, and  MERS as more specifically described herein after.

45.    Plaintiff alleges that  such  documents and representations were submitted in connection  with  the  perpetration  and  perpetuation  of  predatory  mortgage  lending  practices  and mortgage origination fraud.

46.    Plaintiff alleges that  said defendants materially omitted to disclose to plaintiff that in fact plaintiff was unsuitable for such  mortgages, that  said defendants' agents  and representatives represented and confirmed to plaintiff that in order for plaintiff to obtain approval of such mortgages that plaintiff's stated monthly income must be materially overstated upon the Fannie Mae Form 1003, and that said defendants knew and had reason to know that plaintiff was unsuitable to qualify and obtain said mortgages and incur both an adjustable rate note and a balloon payment note.

47.    Plaintiff alleges that West Valley Enterprises and West Valley Mortgage, represented and confirmed to plaintiff that the Fannie Mae Form 1003, which   Brandon Rakes generated and prepared  for  the  purpose  of  allegedly  qualifying  plaintiff  to  obtain  approval  for  the  two  [2] mortgages, that such a form was routinely required for submission in connection therewith; however, plaintiff was also told by West Valley Enterprises and West Valley Mortgage, by and through Rakes, that due to plaintiff's excellent credit, there was no need or requirement for plaintiff to execute said form, and that the form would remain in the file as a matter of corporate  formality and practice since the mortgages were "no doc" mortgages.

48.    Plaintiff alleges that Rakes, West Valley Enterprises, and West Valley Mortgage, knew at that time, in early April, 2006, that the stated monthly income of the plaintiff, as inserted and reported upon the Form 1003 by Rakes,  was materially inaccurate, that said defendants persisted upon the use of the $20,500.00 @ month figure, which in fact was  only an amount to be received from the anticipated sale of plaintiff's two [2] Florida real properties; and, moreover,  that plaintiff

15     SECOND AMENDED RICO COMPLAINT

1   had previously borrowed  the $25,000.00,  from a third party in order to wire those monies directly

2   to Stewart Title and Escrow for purposes of closing the   escrow.   Plaintiff in fact wired

3   approximately $25,000.00, to that escrow company for the purpose of paying West Valley

4   Enterprises, and West Valley Mortgage, according to the 10 April 2006, letter from Kelly Weaver,

5   Stewart Tile & Escrow, sent to plaintiff's  address in Mill Valley, CA.

6        49.    Plaintiff alleges that plaintiff expressly represented and explained to West Valley

7   Enterprises and West Valley Mortgage at the time of the person-to-person interview (early April,

8   2006) for preparing the Form 1003 that plaintiff held approximately $25,000.00, to be applied

9   towards costs of closing at escrow.  Plaintiff alleges that West Valley Enterprises and West Valley

10  Mortgage told plaintiff that in order to be assured of approval of both the first and the second

11  mortgages, plaintiff would have to, and must represent, that plaintiff earned $20,500.00, monthly,

12  when in fact, plaintiff told said defendants that plaintiff did not earn such an amount.

13       50.    Plaintiff alleges that said defendants represented and confirmed to plaintiff that

14  based upon the prevailing real estate market in early 2006, that plaintiff would be able to successfully

15  sell, or "flip," plaintiff's two [2] rental properties located in Florida, thereby satisfying the

16  outstanding mortgages thereon, and apply some or all of the net proceeds generated thereby towards

17  payment upon the residential property acquired under the mortgages identified herein.

18       51.    Plaintiff alleges that said defendants materially omitted to disclose to plaintiff the

19  material fact that MERS could not, as a matter of law, be designated as a nominee of the lender

20  under the deeds of trust inasmuch as MERS lacked requisite statutory legal standing under both

21  Article III  of  the Constitution of the United States of America for purposes of initiating and

22  prosecuting  foreclosure  sales as a  beneficiary under the Washington Deed of Trust Act  [R.C.W.

23  61.24.010, et.seq.].

24       52.    Plaintiff alleges that the following written provision embodied within

25  the  deed  of  trust securing the $600,000.00, mortgage note executed between plaintiff and West

26  Valley Enterprises regarding the capacity and position of MERS  is materially misrepresentative of

27  the legal relationships between the parties:

28       *Deed of Trust*, dated April 7, 2006.  Trustee designated: Quality Loan Services, 1770 Fourth

16    SECOND AMENDED RICO COMPLAINT

Avenue, San Diego, CA 92101; *MERS* [*Mortgage Electronic Registration Systems, Inc.*] "acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument." Plaintiff identified as 'Grantor" and MERS identified as 'grantee." Pages 3 and 4 of 16 states the role of MERS under the Deed of Trust:

"TRANSFER OF RIGHTS IN THE PROPERTY"

"The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender: (I) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described  property located in the COUNTY of THURSTON:  SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.  (STATE: WASHINGTON, COUNTY: THURSTON) which currently has the address of 13625 93rd Avenue Southeast, Yelm, Washington 98597 ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. Borrower understands  and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Interest, but, if necessary to  comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the  right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument."

[Cross reference NON-UNIFORM COVENANTS, Paragraph # 22, Page 14 of 16]:

"If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to

1    cause the Property to be sold.  Trustee and Lender shall take such action

2    regarding notice of sale and shall give such notices to Borrower and to other

3    persons as Applicable Law may require. * * *."

4    53.    Plaintiff alleges that MERS lacks the requisite statutory capacity to

5    serve as the nominee for the lender, and therefore as a matter of law, cannot and is legally incapable

6    of serving as a beneficiary under the deed of trust for purposes of the Washington Deed of Trust Act.

7    54.    Plaintiff alleges that during all times material herein, up through and including early

8    2011, complied with the terms and the conditions of the deeds of trust, the adjustable rate note, and

9    the note.  Plaintiff tendered and transmitted monthly payments under both the adjustable rate note

10   and the note to the successors in interest to West Valley Enterprises, Inc., and West Valley Mortgage,

11   specifically, Novastar Mortgage, Wilshire Credit Corporation, and, most recently Bank of America

12   Home Loans, Bank of America Corporation, Bank of America, N.A., and BAC Home Loans

13   Servicing, LP, a subsidiary of Bank of America, N.A.

14   55.    Plaintiff alleges that plaintiff tendered monthly payments to Novastar Mortgage,

15   upon both deeds of trust, in excess of $ 5,000.00, a month, sending payments from plaintiff's

16   personal residence in Yelm, Washington, to  Novastar's corporate offices located at 8140 Ward

17   Parkway, Suite 300, Kansas City, Missouri 64114, commencing 1 June 2006, such payments

18   traversing federal interstate boundaries.

19   56.    Plaintiff alleges that plaintiff tendered monthly payments to Wilshire Credit

20   Corporation, upon both deeds of trust, in excess of $ 6,250.00, a month, sending payments from

21   plaintiff's personal residence in Yelm, Washington, to Wilshire Credit Corporation corporate offices

22   located at Post Office Box 7195, Pasadena, California 91108-7195, commencing 24 July 2006, such

23   payments traversing federal interstate boundaries.

24   57.    Plaintiff alleges that plaintiff tendered monthly payments to Wilshire

25   Credit Corporation, upon both deeds of trust, in excess of $ 6,250.00, a month, sending payments

26   from plaintiff's personal residence in Yelm, Washington, to Wilshire Credit Corporation corporate

27   offices located  at Post Office Box 7195, Pasadena, California 91108-7195, commencing 24 July

28   2006, such payments traversing federal interstate boundaries.

18    SECOND AMENDED RICO COMPLAINT

1      58.      Plaintiff alleges that plaintiff tendered monthly payments to Bank of America, N.A.,

2   Bank of America Corporation, BAC Home Loans Servicing, LP, and Bank of America Home Loans,

3   upon both deeds of trust, in excess of $ 6,250.00, a month, sending payments from plaintiff's

4   personal residence in Yelm, Washington, to Wilshire Credit Corporation corporate offices located

5   at Post Office Box 515503, Los Angeles, CA 90051-6803, commencing in September, 2010, and

6   continuing up to and including early 2011, such payments traversing federal interstate boundaries.

7      59.      Plaintiff has tendered and paid defendants since June 1, 2006, in excess

8   of $400,000.00, under both deeds of trust, the adjustable rate note, and the note.     Plaintiff has

9   tendered and paid defendants, and those successor in interest entitles Novastar, Bank of America,

10   N.A., Wilshire Credit Corporation,  BAC Home Loans Servicing, LP, and Bank of America

11   Corporation, approximately $5,600.00, a month on the first mortgage, and approximately $1,500.00,

12   a month on the second  mortgage, every  month,  since  1 June 2006.

13      60.      Plaintiff alleges that commencing on 1 May 2008, and continuing thereafter,

14   plaintiff's monthly payments  under the Adjustable Rate Note, dated 7 April 2006, increased as

15   evidenced by Paragraph 4 thereto, the rate tied to an index subject to fluctuation.

16      61.      Plaintiff alleges that the interest only monthly payments under the first mortgage,

17   consisting of $4,550.00, per month, for the first 60 months, as evidenced by the Interest–Only

18   Addendum To Fixed/Adjustable Rate Note, dated 7 April 2006, were tendered and accepted by

19   West Valley Enterprises, Inc., and the subsequent  successors in interest and assignees thereof,

20   notwithstanding the federal Truth in Lending Disclosure Statement dated 7 April 2006, wherein

21   plaintiff was required to pay $4,550.00 per month, for 24 months beginning 1 June 2006, $5,375.00

22   per month, for 36 months beginning 1 June 2008, and $5,772.56 per month, for 299 months

23   beginning 1 June 2011, and $5,767.04 per month for 1 month beginning 1 May 2036.

24      62.      Plaintiff alleges that during all times material herein that plaintiff that

25   Note Holder at no time transmitted, served, or otherwise provided and presented any written

26   notification in the changes to the interest rate as required pursuant to Section 4(E) of the Adjustable

27   Rate Note.

28      63.      Plaintiff alleges that the promotion of the mortgage financing was offered  to

19      SECOND AMENDED RICO COMPLAINT

plaintiff to intentionally steer plaintiff into  high risk, unsuitable mortgages when in fact plaintiff qualified for conventional mortgage financing.  Plaintiff alleges that the mortgages offered to plaintiff were the subject of mortgage securitization and bundled and pooled for issuance in the mortgage backed securities market.  Plaintiff alleges that as a result of such mortgage securitization that the Note Holder of both notes is, and remains, unknown to plaintiff.

64.   Plaintiff alleges that on 4 April 2011, BAC Home Loans Servicing, LP, sent a letter through federal mails from Bank of America Home Loans, Simi Valley, CA, to plaintiff's residential property in Yelm, WA, a NOTICE OF INTENT TO ACCELERATE upon  behalf of  the promissory note holder, and that the mortgage loan was in default.  The letter stated that  plaintiff had the right to cure the default by 4 May2011, with tendering payment of $10,296.90, and if not, the mortgage payments would be accelerated and becoming due and payable in full, and foreclosure proceedings would be initiated at that time.

65.   Plaintiff alleges that plaintiff received a similar letter dated 4 April 2011, from BAC Home Loans Servicing, LP, relative to the second deed of trust and balloon payment  note, demanding payment of $2,893.60.  A subsequent statement notice dated 27 May 2011(pertaining solely to the second deed of trust and balloon payment  note) was also received by plaintiff.

66.   Plaintiff alleges that on 20 June 2011, plaintiff received from BAC Home Loans Servicing, LP, a letter from Bank of America Home Loans, dated 16 June 2011, regarding the availability of Bank of America's Home Affordable Modification Program.  Plaintiff previously received a comparable letter dated Notice Date: 20 May 2011, setting for alternative options for plaintiff to consider that included short sale and deed in lieu alternatives.

67.   Plaintiff alleges that the present fair market value of plaintiff's residential real property is worth substantially less, notwithstanding plaintiff's expenditure of in excess of $400,000.00, in interest only mortgage payments under both deeds of trust.

68.   Plaintiff alleges that the serial _interest_ _only_ monthly payments effected by plaintiff, exceeding $5,000.00, traversing federal interstate boundaries, paid to West Valley Enterprises, West valley Mortgage, Novastar Mortgage, Inc., Wilshire Credit Corporation, Bank of America, N.A., Bank of America Corporation, BAC Home Loans Servicing, LP, and Bank of

1  America Home Loans, constituted the obtaining and the receipt of monies exceeding $5,000.00,

2  by fraud, conversion, and false pretenses across federal interstate boundaries. Plaintiff alleges that

3  such conduct constitutes contravention of Title 18 United States Code §§ 2314-2315, and, as such,

4  constitutes a form of "racketeering activity," as that term is defined pursuant to RICO Title 18 United

5  States Code § 1961(1)(B).

6       69.   ReconTrust is acting as a foreclosure trustee within the State of Washington.

7  ReconTrust is now, and has been at all times materially relevant herein, acting as a trustee on

8  thousands of deeds of trust throughout the State of Washington and is thus engaged in trade or

9  commerce within the meaning of R.C.W. 19.86.020.

10       70.   ReconTrust is a foreclosure trustee that has failed to comply with the procedures of

11  the Deed of Trust Act in each and every foreclosure it has conducted since at least 12 June 2008, and

12  it is a trustee who is wholly owned by the loan servicer seeking to foreclose. ReconTrust regularly

13  acts as a successor trustee for deeds of trust secured by residential real property located within the

14  State of Washington.

15       71.   ReconTrust's failures to abide by the Deed of Trust Act have concealed material

16  information needed and required by homeowners to assert rights and defenses stemming from their

17  mortgage loan transaction, to meaningfully negotiate the terms of a loan modification, to exercise

18  their statutory right to reinstate their mortgage, to cure their defaults, and to postpone or stop a

19  foreclosure sale.

20       72.   Plaintiff alleges that each of the following configurations, for purposes of plaintiffs'

21  RICO §1962 claims for relief, constitute a RICO "enterprise," as that term is defined pursuant to

22  RICO §1961(4) and within the strictures of *Boyle v. United States*, 129 S. Ct. 2237 (2009) and

23  *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)(en banc):

24           A.   RICO Enterprise No. 1: BAC Home Loans Servicing, LP, Bank of America

25               Corporation, Bank of America Home Loans, and Bank of America, N.A.,

26               constitutes a RICO enterprise, organized and maintained by and through a

27               consensual hierarchy of partners, managers, directors, officers, supervisors,

28               agents, deputies, and/or representatives that formulate and implement

1  policies relative to the  promoting, soliciting, advancing and/or otherwise

2  operating a business organization for the purpose of the facilitating,

3  furthering, and promoting mortgage  lending services, mortgage servicing,

4  mortgage  financing, mortgage consulting, commercial financing services,

5  and financial investment planing and consulting, both domestically and

6  internationally, including, but not restricted to, the raising of monetary funds

7  by and    through solicitation, employing federal mails and/or federal

8  interstate wires.

9    B.    *RICO Enterprise No .2:*  MERS [Mortgage Electronic Registration Systems,

10  Inc.] constitutes a  RICO  enterprise organized and maintained by  and

11  through a consensual  hierarchy of partners, managers, directors, officers,

12  supervisors, agents, deputies, and/or  representatives formed in 1993 by the

13  Mortgage Bankers Association, Fannie Mae, Freddie Mac, Ginnie Mae, the

14  Federal Housing Authority, and the Department of Veterans Affairs.  MERS

15   provides a national electronic registry that tracks the transfer of ownership

16  interests and servicing rights in mortgage loans.  MERS becomes the

17  mortgage of record for participating members through assignment, and is

18  listed as the grantee in county records.  MERS is compensated for its services

19  by fees charged to participating MERS members.  The lender retains the note

20  and the servicing rights to the mortgage, and can sell these interests without

21  having to record the transaction in the public record. MERS plays a  key,

22  pivotal role in permitting entities to securitize home loans.

23    C.    *RICO Enterprise No.: #: 3:    ReconTrust Company, N.A.*, is a constitutes a

24  RICO  enterprise, organized and maintained by  and  through a consensual

25  hierarchy of partners, managers, directors, officers, supervisors, agents,

26  deputies, and/or  representatives that formulate and implement policies

27  relative to  provide  services required to protect a note holder's interest and

28  rights in the property and under  the note and security instrument, including

22    SECOND AMENDED RICO COMPLAINT

foreclosure and/or any remedies related thereunder ("Foreclosure Services"), by and through facilitation, and acting in concert with, MERS ["beneficiary"/"nominee], Bank of America, N.A., ["servicer"], and U.S. Bank, National Association, [allegedly US Bank investor number 7040083 "owner"/"holder" of mortgage note], domestically, including, employing the federal mails and/or federal  interstate wires to initiate, prosecute, and execute foreclosure activities as the "foreclosing trustee" of Bank of America, N.A. ReconTrust is acting as a foreclosure trustee within the State of Washington, and such activities constitute both contravention of Washington's Deed of Trust Act and contravention of Washington's Consumer Protection Act as alleged herein.

73.   Plaintiff alleges that in conducting the business and affairs of the RICO enterprises, and in committing the acts, omissions, misrepresentations, and breaches referred to herein between June, 2006,  and  continuing up through and including the initiation of these  proceedings, RICO defendants  engaged in a RICO pattern of racketeering activity in contravention of Title 18 United States Code §1962 inasmuch as said defendant was employed by, or associated with, said RICO enterprises that are engaged in activities that affect federal interstate and/or foreign commerce, and conducted such multiple RICO enterprise affairs by and through a RICO pattern of racketeering activity.

74.   Plaintiff  alleges  that  defendants  engaged  in  the above activities and/or conduct that constitutes  the following form of "racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(1) of the Racketeer Influenced  and Corrupt Organizations Act of 1970 ["RICO"].  Plaintiff alleges that the forms of "racketeering activity" include, and are not restricted to, various formulations of  conspiracy to aid and abet, and aiding and abetting a conspiracy: Title 18 U.S.C. §§ 2, 1341, 1343, 1346, 1952, 1956, 1957, 2314, and 2315. Plaintiff alleges  that the above activities and/or conduct engaged  in by RICO defendants  constitute  a "pattern of racketeering activity," as that term is defined pursuant to RICO§1961(5).

75.   Plaintiff alleges  that the defendants knew that by promoting and offering the

23    SECOND AMENDED RICO COMPLAINT

mortgages to plaintiff, specifically, "no-doc" mortgage loans, and also to similarly situated victims, that the _interest only_ payments during the first five [5] years under the first mortgage [2006-2011], and similar payments under a balloon payment note due under the second mortgage, were in fact the result of engaging in predatory mortgage lending practices.

76.    Plaintiff is entitled to recover compensatory damages, according to offer of proof at time of trial, including attorneys' fees, costs, and expenses incurred herein.

FIRST CLAIM FOR RELIEF

[For Commission of Primary Contravention of RICO Sections 1962(a),(b), and (C) of the Racketeer Influenced and Corrupt Organizations Act of 1970]

["RICO"][Title 18 United States Code §§1962(a), (b), and (C)]

[Against All Defendants]

77.    For Plaintiff's First Claim for Relief, plaintiffs reallege and incorporate Paragraphs 1 through 76.

78.    Plaintiff alleges that the afore described activities constitute conduct engaged in by defendants to deprive plaintiffs of their interest in business and/or property, by and through commission of acts that are therefore indictable as "racketeering activity," as that term is defined pursuant to Title 18 United States Code §1961(1)(B).

79.    Plaintiff alleges that the course of conduct engaged in by said defendants constitute both continuity and relatedness of the racketeering activity, thereby constituting a "pattern of racketeering activity, as that term is defined pursuant to Title 18 United States Code §1961(5).

80.    Plaintiff alleges that the aforementioned pattern of racketeering activity committed by said defendants is both related and continuous inasmuch as it is designed and/or intended to cause damage and/or injury to the interest in business and/or property of plaintiff, and plaintiff reasonably believes and apprehends that such conduct shall and will continue prospectively with correlative long term injury.

81.    Plaintiff alleges that each of the afore referenced [3] configurations alleged in ¶ 72, for purposes of plaintiffs' RICO §1962 claims for relief, constitute a RICO "enterprise."

82.    Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964©), treble damages in the amount to be determined by offer of proof at time of trial, including an award of attorneys' fees, costs, and expenses incurred herein.

24     SECOND AMENDED RICO COMPLAINT

SECOND  CLAIM  FOR  RELIEF
[For RICO Aiding and Abetting Primary Contravention of RICO Sections 1962(a), (b), and (C)
of  the Racketeer Influenced and Corrupt Organizations Act of 1970]
["RICO"][Title 18 United States Code §§ 2(a)-(b) and §§1962(a, (b), and (C)]
[Against All Defendants]

83.     For  Plaintiff's  Second   Claim  for Relief, plaintiff realleges  and incorporate Paragraphs 1 through 76.

84.     Plaintiff alleges that the defendants  employed  the  federal mails and/or federal interstate wires, as well as engaged in racketeering activity as alleged herein, to aid and abet the primary RICO § 1962(a), (b), and 1962(C) contraventions committed by defendants  as alleged herein above. Plaintiff alleges that defendants  were knowledgeable and  aware of the  commission of the primary RICO contraventions committed,  and  that said defendant s substantially assisted in   the commission  of  the   primary RICO contraventions by defendants, thereby deriving a monetary  benefit as a result to the detriment of plaintiffs.

85.     Plaintiff is   entitled to recover, pursuant to Title 18 United States Code §1964(C), treble damages in the amount to be determined by offer of proof at time of trial.  Plaintiff is  also entitled to recover attorneys' fees and costs of this litigation,.

THIRD  CLAIM  FOR  RELIEF
[For Commission of Conspiratorial  Contravention  of  RICO Section 1962(a), (b), and (C)) of
the Racketeer Influenced and Corrupt Organizations Act of 1970]
[RE: RICO Section 1962(d)\Pinkerton Doctrine]
[RE: *Pinkerton, v. United States*, 328 U.S. 640 (1946)
and  *Salinas, v.  United States*, 522 U.S. 52 (1997) Conspiratorial Liability]
[Against All Defendants]

86.     For Plaintiff's Third   Claim for Relief,   plaintiff realleges and incorporates Paragraphs 1  through 76.

87.     Plaintiff alleges that commencing in June, 2006,  and during and at all times material herein thereafter, defendants mutually agreed to engage in the aforementioned racketeering activities and/or wrongful conduct giving rise to the RICO Sections 1962(a), (b), and (C) contraventions, that the objective of that mutual agreement was to destroy Plaintiff interests in business and/or property, and that such conspiratorial conduct constitutes  contravention  of  RICO Section 1962(d).

88.     Plaintiff alleges that defendants are  conspiratorially liable  under  application of the *Pinkerton* Doctrine [*Pinkerton, v. United States*, 328 U.S. 640 (1946) and *Salinas, v. United States*, 522 U.S. 52 (1997)] for the substantive RICO Sections 1962(a), (b), and (C) contraventions

25      SECOND AMENDED RICO COMPLAINT

committed by defendant inasmuch as:

        A.    Defendants engaged in the fraudulent activities that constitute the RICO §1961(5) pattern of racketeering activity;

        B.    Defendants are members of the RICO §1962(d) conspiracy designed and intended to contravene RICO § 1962(a), (b), and (C);

        C.    Defendants engaged in activities in furtherance of advancing and promoting the RICO §1962(d) conspiracy designed and intended to contravene RICO § 1962(a), (b), and (C);

        D.    Defendants are members of the RICO §1962(d) conspiracy at and during the time frame the fraudulent activities were committed that constitute the RICO §1961(5) pattern of racketeering activity; and,

        E.    The offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

      89.    Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964(C), treble damages in the amount to be determined by offer of proof at time of trial, including an award of attorneys' fees and costs of this litigation.

FOURTH CLAIM FOR RELIEF
[For Entry of Federal Declaratory Judgment Relief Pursuant to the
Federal Declaratory Judgment Act of 1946]
[Title 28 U.S.C.§§ 2201-2202]
[Against All Defendants]

      90.    Plaintiff, for a Fourth Claim for Relief, realleges and incorporates herein Paragraphs 1 through 76.

      91.    Plaintiff alleges that an actual controversy has arisen and now exists between plaintiff and defendants pertaining and/or materially relating to the legal rights and duties of the plaintiffs and said defendants arising from the activities of said defendants committed as alleged herein above.

      92.    Plaintiff alleges that defendants engaged in conduct constituting predatory mortgage lending practices regarding the deeds of trust, adjustable rate note, and note, as well as the

documents generated and executed contemporaneous therewith.

93.     Plaintiff alleges that said defendants materially omitted to disclose to plaintiff the material fact that MERS could not, as a matter of law, be designated as a nominee of the lender under the deeds of trust inasmuch as MERS lacked requisite statutory legal standing under both Article III of the Constitution of the United States of America for purposes of initiating and prosecuting  foreclosure sales as a  beneficiary under the Washington Deed of Trust Act.

94.     Plaintiff alleges that the following written provision embodied within the  deed  of  trust securing the $600,000.00, mortgage note executed between plaintiff and West Valley Enterprises regarding the capacity and position of MERS  is materially misrepresentative of the legal relationships between the parties as specifically set forth and alleged with ¶ 52 above. Plaintiff alleges that the "holder" of the mortgage notes, US Bank investor number 7040083, cannot as a matter of law be a "holder" as alleged above.

95.     Plaintiff alleges that MERS lacks the requisite statutory capacity to serve as the nominee for the lender, and therefore as a matter of law, cannot and is legally incapable of serving as a beneficiary under the deed of trust for purposes of the Washington Deed of Trust Act. Plaintiff alleges that MERS lacks said standing also as to the second mortgage evidenced by a deed of trust executed between the parties for $150,000.00.

96.     Plaintiff alleges that a declaratory judgment is necessary in that plaintiff contends, that  defendants  deny, liability to plaintiff  as alleged herein above, and that plaintiff contends, and that defendants deny, that MERS lacks the requisite statutory capacity to serve as the nominee for the lender.

97.     Plaintiff  respectfully petitions  this  Honourable Court to enter declaratory judgment against the afore identified defendants as follows:

        A.    That this Honourable Court declare that MERS lacks the requisite statutory capacity to serve as the nominee for the lender, and therefore as a matter of law, cannot and is legally incapable of serving as a beneficiary under the deed of trust for purposes of the Washington Deed of Trust Act.

        B.    That this Honourable Court declare that the two [2] Deed of Trust

instruments, Adjustable Rate Note, Note, and all documents generated by defendants that were executed between the parties, including all successors in interests and assignees, be judicially invalidated and vitiated as a matter of law inasmuch as the mortgages were the product of predatory mortgage lending practices, that each and every instrument be rendered null and void, without independent legal significance, that plaintiff be judicially declared not liable thereunder, and that the plaintiff be judicially declared to be the fee simple absolute owner of said residential real property interests.

98.   Plaintiff further requests  recovery of attorneys' fees and costs incurred herein in connection with prosecuting this  claim.

FIFTH  CLAIM  FOR RELIEF
[For Contravention of Washington Consumer Protection Act]
["WASH CPA"][R.C.W.§§ 19.86.010, 19.86.20, 19.86.090,  and  19.86.140]
[Against All Defendants]

99.   Plaintiff, for a Fifth Claim for Relief, realleges  and incorporates herein Paragraphs 1 through 76.

100.   Plaintiff alleges  that defendants,  and other agents, employees,  representatives, directors, officers, and nominees of  defendants, are  engaged in the business of providing services and/or activities that involve maintaining and operating  Internet web sites   promoting, soliciting, advancing and/or otherwise operating a business organization for the purpose of offering services for purposes including, but not restricted to, mortgage financing of residential real property, commercial and industrial financial lending, financing real property acquisitions, real property developments, real property joint ventures, real property personal  residential properties, mortgage loan servicing, and/or commercial lending, offered  to persons and/or  businesses by  soliciting, attracting, and acquiring clientele located throughout the United States of America, including Washington.

101.   Plaintiff alleges that defendants' conduct complained of herein constitutes engaging in the promotion of predatory mortgage lending practices and mortgage loan origination fraud.

102.    Plaintiff further alleges  that said defendants engaged in the activities complained hereof   with reckless disregard and/or specific intent   to destroy, harm, and/or injure plaintiff's

1  interests in business and/or property and derive a monetary and/or business benefit as a direct and

2  proximate cause thereby. Plaintiff is informed and believes, and based thereupon allege that

3  defendants engaged in similar conduct with similarly situated victims others, and alleges that such

4  activities constitute the rendition of unfair business practices and contravene the Washington

5  Consumer Protection Act, R.C.W. §§ 19.86.020, 19.86.090, and 19.86.140.

6      103.   Plaintiff alleges that said defendants engaged in conduct that constitutes

7  an unfair and/or deceptive trade practice, in trade or commerce, that impacts the public interest,

8  which causes injury to the plaintiff in plaintiff's business or property, and which said injury is

9  causally linked to the unfair or deceptive act. Plaintiff alleges that as a proximate result of

10  defendants' conduct, plaintiff sustained injuries to plaintiff's interests in business and/or property.

11      104.   Plaintiff alleges that defendants' conduct constituted primary, secondary, or aiding

12  and abetting, and *Pinkerton* Doctrine [*Pinkerton, v. United States*, 328 U.S. 640 (1946)]

13  conspiratorial contraventions of substantive R.C.W. §§ 19.86.090 and 19.86.140.

14      105.   The aforementioned defendants in this Claim for Relief are conspiratorially liable

15  under application of the *Pinkerton* Doctrine [*Pinkerton, v. United States,* 328 U.S. 640 (1946) for

16  the substantive R.C.W. §§ 19.86.090 and 19.86.140 provisions committed by defendants inasmuch

17  as:

18      A.   Defendants engaged in the fraudulent activities that constitute the civil

19          conspiracy to contravene R.C.W. §§ 19.86.090 and 19.86.140 upon the

20          plaintiff;

21      B.   Defendants are members of the conspiracy designed and intended to harm

22          and/or injure plaintiff;

23      C.   Defendants engaged in activities in furtherance of advancing and promoting

24          the conspiracy designed and intended to harm and/or injure plaintiff;

25      D.   All defendants are members of the conspiracy at and during the time frame

26          the fraudulent activities were committed that constitute the civil conspiracy

27          to effect harm and/or injure plaintiff; and,

28      E.   The offense fell within the scope of the unlawful agreement and could

29    SECOND AMENDED RICO COMPLAINT

1    reasonably have been foreseen to be a necessary or natural consequence of the

2    unlawful agreement.

3        106.    The conduct of defendants, and each and everyone of them, constituted

4    wilful, wanton, and reckless disregard for the rights of plaintiff. Plaintiff alleges that as a direct and

5    proximate result of the conduct, plaintiff sustained mental distress and suffered outrage.

6        107.    Plaintiff is entitled to recover compensatory damages according to

7    offer of proof at time of trial, and trebled, in accordance with R.C.W. § 19.86.090, not to exceed

8    $25,000.00. Plaintiff is entitled to recover attorneys' fees, costs, and statutory prejudgement interest

9    provided under R.C.W. § 19.86.090.

10   *PRAYER*

11       *WHEREFORE*, plaintiff prays for judgment against defendants, and each and every one

12   of them, jointly and severally, as follows:

13   1.        For compensatory damages, according to offer of proof at time of trial, attorneys'

14               fees, costs, and expense of suit, arising from contravention of RICO § 1962(a)-(d),

15               trebled pursuant to RICO Section 1964© [Title 18 United States Code § 1964(C)];

16   2.        For entry of appropriate federal declaratory judgment relief;

17   3.        For recovery under federal supplemental claims jurisdiction; and,

18   4.        For such further and other relief as this Honourable Court deems just and proper

19               in the premises.

20   Dated: 23 April 2012.

21                   Dean Browning Webb, Esquire,
                          WASH SBN # 10735

22                   Attorney and Counselor at Law
                The Law Offices of Dean Browning Webb

23                   515 East 39th Street
                Vancouver, Washington Zip Code 98663-2240

24                   Telephone: [503] 629-2176
                Electronic Messaging Address: ***ricoman1968@aol.com***

25

26                   By:  */s/ Dean Browning Webb*_____
                Dean Browning Webb

27                   Attorneys and Counselors at Law for Plaintiff:
                Heather Belinda Singleton

28

1

CERTIFICATE OF SERVICE

2

I, Dean Browning Webb, do certify and declare that on 23 April 2012:

3

Your declarant electronically filed the second amended RICO complaint, with the Clerk of
the Court employing the CM/ECF System who will send notification of such filing to the following

4

parties who have appeared in this action as of today's date:

5

Abraham K. Lorber, Esq.
John S. Devlin, III, Esq.

6

Lane Powell PC
1420 Fifth Avenue, Suite 4100

7

Seattle, WA 98101-2338
Electronic Messaging Address:

8

LorberA@lanepowell.com
DevlinJ@lanepowell.com

9

Attorneys for Defendants: Bank of America, N.A., Recontrust Company, N.A., and
Mortgage Electronic Registration Systems, Inc.,and U.S. Bank, N.A.

10

11

I declare under penalty of perjury, under the laws of the United States of America, that the
above is true and correct.

12

Executed this _23rd_ day of April, 2012, at Vancouver, Washington.

13

14

By:/s/Dean Browning Webb
Dean Browning Webb

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31    SECOND AMENDED RICO COMPLAINT